to be holding sessions here today at the Houston Law Center. We appeared here in the mid-nineties and are very pleased to be back. Appreciate the chance to have our normal engagement with counsel for the parties in the cases but also to have the opportunity to talk with the students and faculty after these arguments are finished. Our argument calendar today consists of five cases. Two of them will be submitted without oral argument later today on the briefs. Those are Appeals 1330, American Rice v. Dunmore Properties and Appeal 3200, Gibson-Michaels v. Federal Deposit Insurance Corporation. Three cases are before us for argument. We'll hear argument first in Appeal 3155, Armstrong v. Department of Treasury. Mr. Burns, good morning to you. Good morning, Your Honor. Welcome to the court. Thank you. Please proceed. Thank you, Your Honor. This is my first time, frankly, arguing an appeal and my first time before this court. Going first is both a blessing and a curse in some way. This case arises out of an attack on a settlement agreement entered into below involving the Treasury Inspector General's Office for Tax Administration. We are pretty well familiar with the facts and the history, so you should probably proceed right to your core contention on appeal as to why the settlement agreement should be viewed as invalid. Well, the fundamental issue for Mr. Armstrong when he negotiated the settlement agreement was the idea that he could obtain employment at the United States Department of Agriculture and that the agency would agree to a set of facts that would allow him to do so. Those were negotiated in the settlement agreement and incorporated in a letter. What Mr. Armstrong did not know and could not know was that the agency had had already multiple contacts with the United States Department of Agriculture, many of which were negative. Well, is your allegation of fraud dependent on the February 5th communication from Ms. Cresswell as misrepresenting the true state of the facts? No, that only goes to show evidence that the facts were misstated. The real issue is the fact that the contacts were never disclosed. The question for the court is, under what legal authority would an employer have the right to contact a potential employer and disclose negative information outside the scope of a normal employment relationship? In essence, this extends beyond simply government relations and government employment. In a case like this, an employer would generally be prohibited from disclosing information in the form of a reference without the permission and approval of the individual employee and without that employee's knowledge to some extent. In this particular case, government officials including senior members of, and remember, this is the Inspector General's office, senior members of the Inspector General's office who are apparently neither involved directly in a personnel action or directly in my client's supervision were communicating information that was negative. Well, what is the information? There's a handful of anonymous letters, so that's where some of the information resided. Were there other contacts beyond those letters? I think, correct, yes, there were. I think the case boils down to, at page 12 of the respondent's brief, the respondent says, in essence, that the reason that there's no fraud here, aside from everything else, aside from the fact that one of the contacts was not directly disclosed, even by Ms. Questwell's letter, was, he says, specifically the board held that Mr. Armstrong, having been forced to admit that he lied about the status of the investigation, was the cause of the employment offer being put on hold on August 27th rather than the contacts with the Treasury. That's categorically untrue. Well, how do we know that? Because we haven't yet had the Treasury, pardon me, the agriculture hiring official on the stand. We don't have any testimony from her, right? But that goes to the central issue. There is a factual question that is deeply disputed in this case about what impact these contacts had with the United States Department of Agriculture. For reasons outside the record, in the Privacy Act case, which is on appeal, she was not placed there. Well, what's in the record and what's not in the record? Are the letters in the record in front of the MSPB? The letters are in the record before the MSPB. And do we have declarations or depositions or anything of the sort involving the agriculture department hiring officials? We have the deposition of Ms. Horsley where she indicates that prior even to what really involved the significant contact was the contact from Mr. Delgado. In other words, if you look at page 250 of our submissions, Mr. Delgado tells her when she contacts him regarding these letters, she wants some information regarding the veracity or lack of veracity of these letters. And he says, she says, contrary to what the agency says where Delgado never contacted her, she says, he called me back and said the only thing he could tell me was that he never made statements regarding Mr. Armstrong. He said, quote, that Rodney Davis had called him and told him about the anonymous letter. When I told Delgado that I had understood that the IA internal affairs matter was cleared, he said, what do you mean cleared? Then he said, hypothetically, if I told you there was a matter and it wasn't put to bed yet, that it was still pending, and I'm not saying that at all, but if I did, what would you do? Then he answered his own question and said, you wouldn't hire him and you would document it. Then Harry would get that and then sue me for saying something that caused him not to be gainfully employed at USDA. The conversation was before the December. When was that conversation? That conversation occurred in August. And in your email to Miss Cresswell, you said, tell us about anything that's happened since December. No, I said, tell us about any contacts, and she responded in a dependent clause about December, and I thought she was referring to the January 2nd letter, because that's what she was saying was the only contact. If you read that logically, the import of what was being asked was, what are your contacts with the USDA? And the response was, we got a letter from them on January 2nd, 2007, and a response that has no comment. The we is agriculture? Excuse me? Yes. You said USDA. The United States Department of Agriculture. Agriculture was receiving the information from the Treasury Department. Yes, yes. Mr. Barnes, one question I have is in connection with the petition for review and the process that took place in this case. You had an initial appeal on whether there was a breach of that settlement agreement, and there was an initial decision by the A.J. In that initial decision, there was reference to the fact that you alleged a fraud. Yes. And they said, well, you got to do that in a petition for review. Right. And you went ahead and filed a petition for review. Yes. And the board then said, well, there's a question of timeliness, because that petition had to be filed 35 days from the time of the decision, and that time had long passed. So there was a requirement then to show cause. Right. What's confusing me is that the record of the petition record suggests to me that the board sort of conflated the requirement to show cause with a determination on the merits of the petition for review, determination on the merits of the fraud. Right. And is it your perspective that, or let me back up before I ask the question, because it seems to me that if you make a threshold showing that there was good cause why this petition for review was not timely filed, then you have a right to a full hearing. That is exactly the point. And here they seem to have decided that issue, the fraud issue, on the merits right then and there. Not only did they decide it on the merits right then and there, they did something that was, I think, the violation of the law standard here. They confused materiality of facts with the materiality of result. In other words, if I misrepresent to you material facts, and this circuit is held, I don't have to be intentional about that. If I simply misrepresent to you material facts in terms of a contract, and you know that, and you know I am relying on that misrepresentation, I can set aside that settlement agreement. The fundamental issue that each of the judges What was the misrepresentation? The misrepresentation in this case was the fact that the agency claimed that it did not have any connection with the USDA. And again Where and when did they make that claim? Both on February 5th, and after that That's the Cresswell letter. Yes, that's the Cresswell letter, where she is less than, she is clearly, if you look at that dynamic, I am clearly asking her questions, and she clearly is trying to evade the questions, and then she throws it back and says, well, there are no contacts other than what your client might have done. And so clearly what was being conveyed to What else besides the February 5th letter? Well she didn't Was a representation by Treasury that your client was misled by. We have had no contact since December. But that's the Cresswell letter. Right. Is there anything other than the Cresswell letter? Yes, the agency had a contact in January. Well I understand that, but in terms of misstatements told to your client by anybody in the government, is there anything other than the February 5th Cresswell letter? Well yes, there are misstatements in the fact that Mr. Delgado did not communicate, and the agency did not communicate Mr. Delgado's that the reason my client was fired was because he didn't disclose to Ms. Horsley a personnel action that had occurred. You are not following. I am trying to figure out up to the date that your client signed the agreement, who in the government made a misrepresentation to your client that could have led him to sign the agreement, whereas if he had known the true state of facts, he would not have signed the agreement. Well that's conceded. Ms. Cresswell admits that she didn't let us know about the January 5th contact by, take to law enforcement agents with Ms. Horsley. But she says she didn't know about that. That's irrelevant. The agency is responsible and acts towards agents. It's not my job to figure out which agency official is being candid or not. Does your case rest entirely on allegation of affirmative fraud? They lied to me and that's the reason I signed the agreement? No, one of the things that happened as we alleged is, and we alleged below and then alleged again here, was that, Your Honor, I'd like to, I'll answer this question and say that we're running out of time for rebuttal. We'll give you the reserved time on rebuttal, but we might need to explore some things a little further. Certainly. There is a question of whether there was at minimum a mutual mistake of fact, whether the parties misunderstood what was being said. That's where I want to go with you on this one, counsel. You started out at the very beginning that the settlement agreement was clearly for the purpose of protecting any information going from your client to the Department of Agriculture. I've read the settlement agreement. I don't see anything that specifically makes that point in the settlement agreement. Did I miss something? Well, if you look at, yes, if you look at the- You have to sort of infer, and maybe it's a perfectly legitimate inference that that's what the whole point of it was, but is there anything in the settlement agreement that makes it clear that your client and the government were each operating with the assumption that the purpose of this was to keep any information from the Department of Agriculture? Well, I think the letter that we crafted through the administrative law judge was directed to the USDA for the specific purpose of allowing him to go there. I mean, in essence, that was the whole point. Let's do a reasonable person analysis. What sense would it be for a government employee to take a 30-day suspension and resign when he's vehemently challenging not only the agency on the MSPB action, but in federal court? And the lesson, of course, it was to get new employment within the government. Well, if that's your understanding, then why did you wait to your reply brief before talking about mutual mistake? We did raise it below to the ALJ, and the court has held in Bosley that an issue raised to the ALJ is an issue preserved. But the fundamental issue was, let's assume the breach occurred. What possible remedy can we get? I mean, I think the problem, from a practical attorney standpoint of representing an actual client, it is nice to say this would be a breach, and we find breach. What are our damages? This was withdrawn by the district court. We raised it to show the hostility of the agency and the agency's actions in this regard as not being based on good faith. Did it breach the agreement? Yes. But it didn't do any harm because it was withdrawn and taken out of the court record before it was distributed anywhere. How is the mistake mutual? I thought your basic approach here is to say the government lied to my client, and that's the only reason he signed this agreement. Therefore, the agreement should now be undone. And then you turn around and say both sides had a mutual misunderstanding, the same misunderstanding. That seems inconsistent. Well, no. If you accept the government's premise, there's a mutual mistake. If you accept our premise- No, they aren't saying it's a mutual mistake. They're saying the agreement's just fine and it should be left in place and the case is over. So they don't agree there's a mutual mistake. And I don't understand what you think the mistake was on their side. I understand what you think the mistake was on your side, but to be mutual mistake, it has to be a mistake on the other side as well. Well, there are just two points I would like to raise in response to that. The first is their argument as pled is, look, all we were doing was dealing with the disciplinary action. And our officials didn't disclose anything other than about the disciplinary action. Well, we've shown that they did. Okay? We showed it to Ms. Horsley. They did. And the agency knew that or should have known that and didn't tell us. So there was a mistake as to the operative set of facts. If I accept Ms. Questwell's representation, I didn't know about this third contact. And implicitly, I didn't know about Michael Delgado's contacts with Ms. Horsley because he told me he didn't have them. So the mistake is that the agency didn't have the facts that it needed to even convey a truthful set. Because remember, the significant issue is if I had known, if Mr. Armstrong had known that a law enforcement agent from TIGTA in January or at any time had contacted Ms. Horsley, I can tell this court categorically that he would have never entered that settlement. Well, I understand what the mistake was on your side and the connection between that mistaken understanding of the true facts and agreeing to sign the contract. But I don't understand what the mistake was on the government side that would make it in the legal doctrine a mutual mistake. I see my time is exhausted, Your Honor. It's not exhausting until we're exhausted. Thank you, Your Honor. The mutual mistake, I believe, on their side was that they admit that they did not convey accurate information to me. Yeah, but that might be a breach. It might be a fraud. It might be all kinds of things. But it's not a mistaken understanding of the facts which results in their going into an agreement that if they knew the true facts, they wouldn't go into. Can we get where you want to go? I think this is what Judge Mischel is trying to press you on. Can we get where you want to go if the mistake is only on your side? If the facts do not support affirmative fraud on the part of the government, and I'm not saying they don't, I'm only saying assume no affirmative fraud on the part of the government. Assume no mistake on the part of the government. They knew exactly what they were doing. They were conning your client out of a settlement. Can we get where you want to go simply because you were misled but not affirmatively? Yes, I think that this Court has held that the materiality of the fact is not based on malice. It doesn't even have to be intent. The idea of a contract is that you and I agree to a certain remedy, and in settlement agreements in particular, we agree if I'm the government, he won't sue us on this. Are you conceding that if we fail to find fraud, you have to lose? No. Your case depends on fraud. No. Well, that's what we need to get straight because first there's a question of mutual mistake, then there's a question of fraud, and now you're saying, well, even if there's not a mutual mistake and even if there's not a fraud, it goes what? Because there's a material misrepresentation that goes to the heart of the contract. Even if it falls short of fraud? Right, because the idea is that the government in many ways, as we pled, is under a legal duty independent of any of this case to disclose contacts regarding its employees from outside employers including other federal agencies. Don't you also have an obligation to show intent? Well, yes, but the intent can be inferred by the fact that Ms. Crestwell admits she didn't disclose the contact and that it was known to the agency. But not to her. But it doesn't matter. The agency acts to its agents. I mean, the individual attorney doesn't have to know. Should she have known? Yes. Should she have reasonably known? Yes. She made a representation that turned out to be inaccurate that had we known would have caused us to set aside the settlement agreement. Well, as I understand it, the December and January contacts involved the government's attempt to frame a response to your Privacy Act in the District Court as distinct from the contacts in August and September and in the mid-fall which dealt with the misconduct problem that your client had gotten himself into. So if we discount the December and January contacts as not going against the spirit of the agreement, then you're left with the three or four contacts earlier in the fall. When did you first learn about those contacts? We first learned about the contacts in May when the United States District Court over government objection ordered the surrender. And you filed your renewed action in the MSPB May 28th, right? Right. Immediately. So you acted within a month? We acted within a week. And yet the government says you're untimely because that was 99 days, I guess it is, or so after the February decision by the administrative judge accepting the settlement agreement proffered by the two parties. Do you think that the board used the wrong date to measure whether the 35-day filing deadline was missed here? Yes. In any contract where there's an allegation of fraud, it's from the time of the discovery of the fraud. We wouldn't have raised the petition on contacts we didn't know about. We raised it as soon as we knew about it. And we raised it in response, we actually went to the board in response to a directive from the judge. But the board acted as if you were challenging the February decision of administrative judge Bogle, but you weren't because there was nothing wrong with her actions given what she was handed by the two parties. So you really weren't saying she made a mistake, you were saying we made a mistake. So you weren't challenging her decision, you were challenging your own decision to sign the agreement. No, because we wouldn't have known. We didn't know about the contract. Help me out here. Why don't you say yes to that question? And point out that the reason you were challenging it was because you were misled into signing that agreement because you did not know what the government knew and that they had not disclosed to you. Try that as well. Yes, that's my answer. That's my answer. And I've learned a little in 25 years. The other issue I think that goes to this issue, and I think I misunderstood what the court was saying. The other issue that goes to this is that one of the remedies this court could impose, because a lot of these questions that we are discussing are what are the underlying facts here? What happened to Armstrong? Did he really lose the job? What's the exact relief you want? We would need a remand and an evidentiary hearing so we could figure out whether or not there was actual fraud, whether there was a mistake of fact. One of the people we might have to call is Judge Bogle. When you negotiated in these settlement discussions, what was your impression of what these parties were attempting to negotiate? Did you ask in your brief for a hearing? It seemed to me that, I mean, this gets back to the question I asked earlier about the court seemed to conflate the question of showing cause with the merits of the fraud. But I didn't see anything in your brief where you requested a hearing or whether you suggested that because the board may have conflated these two issues, you were denied the right to a hearing. Well, I think our position on the board was that the action should be reversed and that the remedy should flow from the reversal. I would think that if this court remanded this action for a greater record, there would be an additional remedy of, there has to be a remedy to Mr. Armstrong of what's happened and there has to be a decision. Well, that may be true, but I'm just asking whether you've asked for that. I don't believe I did, in all honesty. I believe that I asked for reversal of the case. But as I did... Where do you want to go back to? Do you want to go back to the A.J. and have a trial on the merits of the removal action? Or do you want to go back to the board to have a further chance to prove that the matter should be reopened? Exactly where do you want to be to do what? I think when I have a rescission argument, I can elect. I think that the case law says that I can choose either to challenge the underlying action and essentially have him the court, the board do an evidentiary hearing through the ALJ on the underlying issue of breach and fraud. The preferable one for us would of course be, because of the remedies, would be to have the action reinstated and have him start ab initio to be able to challenge the action. So you want to go back to where we were on February 1st, before you signed the agreement? Yes. With a pending unresolved appeal from a removal action? That would be one of the remedies. Yes, Your Honor. You ask for, you say, whether you want us to do something. It's not clear, but you say, whatever we do, it should amount to rescission, reform, enforcement, or nullification. And you leave that to us to decide. Well, that's not a bad request. Okay. That's fine. Thank you, Your Honor. We'll hear from the government. Mr. Bowen. May it please the Court? My name is Christopher Bowen and I represent the Respondent, the Department of the Treasury. The issue before this Court is whether the Merit Assistance Protection Board has substantial evidence for its conclusion that Mr. Armstrong had not shown good cause for the delay. Mr. Bowen, did the Board conflate the question of good cause with the merits on this complaint? Well, the Board looked at the issue of timeliness and it had two components. It looked at the diligence, which it said it was diligent, and then it said, well, you had to show good cause. We do not believe that the Board made any improper conflation because what the Board held was because there is nothing that shows the misstatement was either intentional or material, you haven't shown good cause. It's a fraud question, not the question of good cause for the timeliness. The timeliness question would involve issues, would it not, of when did you know and how diligent were you in pursuing this, questions of that sort. And I would expect that if the Board found that good cause had been shown, the next natural step would have been a remand to the AJA for some sort of a hearing, correct? If the Board found that good cause had been shown, then potentially the next step would be a remand. How does one show good cause for undue delay? How do you show good cause? You would show good cause for undue delay by bringing forth what you feel is the evidence that in fact supports a remand to the AJA. A whip. Right. That makes no sense to me at all, Mr. Bowen. As Judge Lynn was trying to suggest to you, if you came to me and said, I can't show up at this argument on the day settled because I have a winning case, or because my case isn't as good as I thought it was, I would say to you, wait a minute. You're asking for a delay in time. You're not asking for me to decide the merits of your case. Tell me your wife just had a baby. Tell me you missed your airplane. Tell me something that has to do with time, not with the merits. I have no understanding how the Board could say, the way we determine whether you are entitled to have us waive the timeframe requirement is by convincing us you're going to wait until the end. Explain to me how that works. It's not evidence sufficient to convince them that he's going to win. It's just some evidence that there is some reason to make everyone go through this process all over again. That's not what the Board said. The Board said, we looked at your case and you have a loser, so we don't waive the time requirement. What do you mean go through it all again? There was never a trial here. There would be, except that an agreement between the parties resulted in a settlement that terminated the case. We're not talking about a retrial here. We've never had the first trial. Correct. There was no trial at all. Then what do you mean about go through it all again? I don't understand your comment. There has been, start the process again for getting up to trial, doing discovery. It's important to note that many of the principles in this case, such as Ms. Creswell, such as Mr. Eckersley, have already been deposed. And so that evidence, Mr. Armstrong did put before the Board. Yeah, but that sort of puts the cart before the horse, does it not? This is saying, well, you kind of already had everything you might have wanted in a hearing, so let's just decide the merits. And if we don't find any merit, then we're just going to say you're not timely. There's a disconnect there, is there not? Well, I think that to some extent you could say that the Board should have been more clear as to what it was doing. But I think that however this decision is supportable. It's not a matter of clarity. It's a matter of they got the rule wrong. I think that are the... We know exactly what they said. They were very clear. Correct. You can't clarify that anymore. Right. The decision speaks for itself. The only thing you do is get a different rule. Is it fair to say that the Board made a finding about materiality and that what it found is that the missing or inaccurate information conveyed to Mr. Armstrong couldn't have been material to his decision? Yes. How can that possibly be right? It seems absolute common sense that anybody in his shoes would have never signed this agreement if he had known that the Treasury officials had already blackballed him with the agriculture officials from whom he was trying to get a new job. Well, I think the Board's decision is correct that the Treasury officials had not blackballed him. These contacts had simply been, for one, investigating the Privacy Act suit and the Well, that doesn't cover the August, September, October, November contacts. If you look at page 250 of the appendix, you'll find an email from Director Horsley to one of her subordinates where she's discussing. And what she says, her description of the Delgado contact in August is very specific in that he is simply saying, I'm not saying whether it's been cleared up one way or the other. I'm just saying I have to go back and check before I make any representations to you because, you know, it's... Come on. In September, he has a job offer from agriculture. And now in February, we're negotiating a settlement agreement. And meanwhile, the offer's been withdrawn. Why would the offer have been withdrawn? Because obviously, agriculture got some new information that was negative. Well, the Board found that the offer was withdrawn because after Director Horsley received some information from Mr. Armstrong and after Director Horsley, after Mr. Armstrong had signed the waiver to permit them to do the background check, she had called him in and said, is this thing all cleared up? And he said, well, I guess it wasn't all cleared up. Well, look, if there might have been one, two, three, or four different reasons why Horsley might have withdrawn the offer, don't we need Horsley on the stand so we can examine her to find out what her real reason was or whether it was several reasons and which ones they were? You're asking us to accept one version of her report of a conversation when we don't have her testimony. Right? We don't have her testimony. Well, Mr. Armstrong is asking... Isn't that correct? We don't have her testimony. We have her deposition. And the supposition about that topic has been placed into the record before this court. So to some extent, she has been examined under oath already. About what her reason was for withdrawing the offer? Yes. And what was her answer? The only reason was what Armstrong admitted to me. None of those other things influenced me at all. Once she learned that there was, in fact, an investigation that had not been cleared up, that's when she decided to put it on hold pending the eventual completion of the investigation. But Mr. Armstrong is not focused, actually, on what Ms. Horsley did. Right. He's focused on what you did, what your client did. Let me read to you. The issue is not whether Mr. Armstrong would have necessarily been hired by the Department of Agriculture, but whether the agency, that's you, when reaching the settlement, hid or misrepresented its substantive discussions with the Department of Agriculture and or, that's a very poor use, and or, but he used it, and or participated in a ruse whereby Mr. Armstrong gave up his substantive attack on the adverse action in return for relief that TIGTA knew would not be granted. Now, what Mr. Armstrong seems to be focused on is the way in which you all extended information to Ms. Horsley, not necessarily what Ms. Horsley did with it, although that, of course, is the outcome of Mr. Armstrong's case. Isn't it the case that you all did provide a lot of information to Ms. Horsley that you never, that you never disclosed to Mr. Armstrong so that he might very well not have entered into that settlement when he did, had he known of what you all had been doing behind closed doors? I would characterize the flow of information as primarily the Treasury investigating Mr. Armstrong's Privacy Act suit. I would direct your attention to pages 177 to 178 in the appendix for the direct, for the notes, and I would then say, yes, the issue is whether we made any representation, but Mr. Armstrong. When was the suit filed? The suit, the Privacy Act suit? Yes. The Privacy Act suit. That was filed in October. So all the contacts before the filing date couldn't have been about the Privacy Act suit. They had to be about what kind of a guy Mr. Armstrong was. Those contacts, one, the employment references when Director Horsley did call up his former supervisor, and two, I would just emphasize to the Court again that the email conversation that Mr. Armstrong is relying on to obtain his misrepresentation argument is specifically limited to the period since December 2007, and this was the period that Mr. Armstrong's attorney put into the email itself. If you look at page 86 in the appendix. I'm back on Judge Plager's question, which is whether the government didn't owe a duty of candor to its employee Armstrong on the eve of the agreement to say, look it, before you sign this agreement dropping your appeal at the Merit System Protection Board, there's some things we have to tell you, and what we have to tell you is that some of our people, maybe without proper authorization, sent letters to the Agriculture Department that may prejudice your chance of getting a job there, and you need to know that so that you can make an informed decision whether you want to sign this settlement agreement or not. Don't you think the government owed that sort of a duty of candor? The government does owe a duty of candor. In this case, Mr. Armstrong was aware of the six anonymous letters. How do we know that? Because he filed the Privacy Act suit based on those six anonymous letters. Were the six letters cited specifically and pleaded in the complaint in October in the Privacy Act suit? I believe they were, yes. I believe that was the reason Director Horsley had called him back in and said, you know, you've received these concerns, and then the contacts have an exemption that when we called up Delgado, he wasn't exactly able to say it was all cleared up, so we need some clarification. It wasn't until after the Privacy Act suit got filed that he learned about the affirmative contacts by the investigators, isn't that correct? It was not until the Privacy Act suit was filed and discovery was had that he got the notes. And discovery was had that the government fessed up to the fact that they'd been busy talking to Ms. Horsley without him knowing it, isn't that true? We gave them the notes of our investigator, but I would contradict the notion that we had been busy. We had different agents investigating the Privacy Act suit. Those were Agents Rock and Agent O'Malley. The people at TICTA who had been in charge of supervising Mr. Armstrong, those had been Agents Delgado and Davis, thus those two investigations had in fact been separate. So what? The government is responsible for the actions of all of its different units, even if the two units are separate from one another. And it seems to me that the government owed it to Armstrong prior to signing the agreement to tell him what had happened. What contacts, what information had been made known to agriculture. Because the government is perfectly aware he was trying to get a job at agriculture, right? The government knew that he had applied for a job. And they knew that the point of the agreement was to hold that possibility open and they knew that it might be under a cloud because of the prior contacts. So they should have told him about the prior contacts. I direct this Court's attention to the fact that the January 2nd letter from Director Horsley was the thing that initiated these discussions. Because the letter said, we have heard that this thing has been all cleared up. So that's what initiated people saying, well, maybe he still has a chance at getting this job. So that's what initiated the discussions. So to some extent, at that point, that's why the email exchange and the specific representation here is limited to the period subsequent to December 2007. Because that was the specific point of the January 2nd letter. Let me ask you this question, Mr. Bowen. I appreciate the fact that you're up here doing your duty as a good lawyer on behalf of your client, even though your client doesn't come off sounding very good in this particular case. Would you agree or disagree with the following statement? Had Mr. Armstrong been advised that there were any contacts between the agency and the Department of Agriculture other than those disclosed by Ms. Creswell, he would have certainly sought to investigate the nature, substance, and impact of such contacts before agreeing to any resignation from TICTA and before agreeing to the settlement document. Would you agree that that's probably true? That had Mr. Armstrong known of the fact, he very well would not have signed that agreement without having further investigated what had gone on? Well, I hate to make any speculation as to what he would have done. However, I think if he had actually had the investigator's notes, which can be found at page 151, of just one telephone call, one very short telephone call by Agent Rock to Director Horsley, I don't think that would have had any significance at all. This telephone call said, hey, in your letter you say, sources say everything's all cleared up. Obviously the Treasury was investigating leaks within the Treasury. So we called up Director Horsley, according to the notes of the investigation, and said, what do you mean by sources? She said, well, I don't really feel like saying right now. And that was the extent of the conversation. I see that my time has almost expired. We ask the Court to affirm the decision of the Court below. All right. Thank you. Mr. Burns, rebuttal. Very brief, Your Honor. There are a couple of things, I think, that need to be cleared up. First of all, Ms. Horsley was never deposed in this case. She was deposed in the Privacy Act suit on unrelated issues and mentioned some matters that bore on these issues. But she's never been deposed on the actual issue of her contacts and the effect and those things. In those depositions, she did say that my client was candid with her, which disagrees with the agency. She also stated that Ms. Delgado had contacts where it disagrees with Ms. Delgado's testimony. Looking at the agents, I'm going to focus just on what the Court just said. Would we have not done this settlement agreement? This was not a contact, and I think the Court needs to bear this in mind. TIGDA didn't send its attorney to go talk to Ms. Horsley. There was no discovery request, no subpoena, no compliance with TUI. They sent a law enforcement agent. The first thing they did was sent the law enforcement agent over to gather letters, and the second thing they did was they sent the law enforcement agents with their badges, who were working for the Inspector General's office, over to talk to her twice. If you look at page 177 and 178, which is the December 12th interview, and you read that interview, you'll see that there's virtually no discussion whatsoever of the Privacy Act. The Privacy Act suit had to do with, did anyone disclose confidential information? The agency's defense to that suit was, no. We don't know anything about it. We didn't disclose it. They sent these law enforcement agents over to reaffirm their position on this case, and they sent those agents to talk to every employee in Armstrong's division. Every single one. And they mentioned his candor, and they mentioned his veracity, and they went into his health issues, and they went into every aspect of his behavior. They knew exactly what they were doing. Whether this court decides for Mr. Armstrong or not, let me leave the court with this. I have the right, in the real world, as a trial attorney, to rely on the candor of my opposing counsel to get information, particularly when it's a government agency that by law has exclusive possession of that, and I have no independent means of getting it, other than requesting it either through the Privacy Act or directly. Had we been aware at any point that any agent spoke to anyone in agriculture, we would have got that case tooth and nail. We were already in a federal lawsuit. We would have certainly not surrendered our rights here. The last thing I'll say is that this was the only reason Ms. Horsley even spoke to these agents was because they were law enforcement agents. It was law enforcement agents speaking to law enforcement agents. There is no doubt whatsoever that had we even had the slightest inkling that any law enforcement agent had spoken to anyone, we would have done two things. Since the Board speaks of harm, let me finish on harm. We would have done two things. We would have pursued the underlying action, not only for the Board proceeding, but for a federal lawsuit, and we would have gone into great detail as to what the agency had accomplished here by contacting Ms. Horsley. I think we have the right to explore that issue at a minimum, and I'd ask the Board to reverse. Thank you. All right. We thank both counsel. The appeal is submitted.